set for argument today, and that's National Labor Relations Board v. Grill Concepts Services. Case numbers 23-78 and 23-361. And I believe we'll hear from Ms. Pazella first. Is that right? That's a good question. I have her listed as petitioner. I have the NLRB listed as petitioner. We're the appellant, so I'm not sure who goes first. We filed our briefs. Go ahead, counsel. You want to go first? I can go first just because we were the appellant. Is the NLRB okay with that? Yes. I assume the confusion is because we have an enforcement action and a petition. All right, we'll go ahead and hear from Mr. Martinez. Thank you, Your Honor. As this Court knows, this is a case that involves the duty to bargain with a union in the face of a 100-year pandemic. So the circumstances are different than your typical duty to bargain situation. Back up because, I mean, I get that you got to that point, and we can talk about that. But there's a lot of history before that. My first question is, I guess your position is that the NLRB was not just considering the prior history as background, but they were actually using that as a basis for a violation. Exactly. But we have case law. Do you agree with that, that they are able to look to the background? So how do we decide whether they were just looking to the background or actually imposing a violation for prior action? I think you look at the record and you look at the findings of the ALJ and the findings of the board. And I think if you look at the entire opinions, there's a very clear message there, that they are out to punish the employer for events that occurred before the charges were filed. The charges were filed in May 2021. It's very clear that the board reached back to find... And what's your example of that? Well, let me read a couple of things from the board opinion, ER 152. It says, we find that respondents' conduct evidenced a pattern of bad faith surface bargaining that continued for longer than a year and a half. Further, this egregious failure and refusal to bargain with the charging party was a continuation of the respondents' unlawful efforts to discourage unionization in the same bargaining unit at issue here. It goes on to say, in light of the respondents' prolonged failure to bargain in good faith and its prior violations. So they are linking everything back in a way that charges, whether you want to call it a charge or something else, but they use the word attack in another part of the opinion. But Mr. Martinez, I mean, to Judge Nelson's earlier point, we have a Frouhoff Trailer Systems case that says, if it's an ongoing violation that continues into the covered period, you can look at the prior actions in conjunction with the violations that are happening during the covered period. So why did the board not do that, or what's wrong with the board having done that here? I don't think they did that. And I think they got a license to do that, to attack provisions or conduct that occurred before the six-month period. And it's evident from the Frouhoff, let me quote the Frouhoff decision, and it says, whereas here the complaint attacks an overall course of bad faith conduct. The word is attack. Well, but you don't disagree that some of the board's actions focus on behavior that was in the last six months? Certainly. They can be considered as evidence to give background, as you suggested. But this decision goes way overboard. Well, but what were the actual violations? The violations seem to stem, as I read it, from the actions in December and January. And those are clearly within the six-month period. Well, that's not entirely correct. Okay. I would say the ALJ found violations going back a year and a half. Well, but we're reviewing the board, and the board scaled that back somewhat. The board scaled back the remedy. Well, but the board also said the date that you could look at was different. Yes, you could look at a different date for the remedy. And I would suggest that if you look at the punishment, if you look at what they ultimately did, they issued an affirmative bargaining order, okay, and then required notices to be posted. But wait a minute. I don't recall you challenging the remedy itself before the board or in your briefing here. You may not have. I'm just trying to illustrate for Judge Nelson why we think that the board went. aren't you bringing up essentially a challenge to the remedy? What do you mean by going overboard? We're not challenging the remedy directly. We're challenging the predicate for the remedies, and the predicate for the remedies are the violations that the ALJ found and the board affirmed. Is it your position that what happened within the six-month period that is properly looked at is not sufficient to establish a violation? That's another question. Within the six-month period, the circumstances were different, okay, because if you look at it, and I'll refer you to the record for that six-month period, and you'll see how this restaurant was just completely eviscerated by the COVID restrictions in Los Angeles. This is a hotel near the L.A. airport, the Westin Hotel. It depends entirely on hotel guests. Okay, so if you look at ER 134, it'll give you the timeline as to what was going on during that six-month period, and basically everything was shut down through most of that period, so they couldn't have any indoor guests. Parts of the time they could have outdoor seating, you know, patio seating, but in a hotel context. Well, Mr. Martinez, can I ask, what about the COVID pandemic precluded the employer from negotiating? Because there were sessions in which, during COVID, there were negotiating sessions, but according to the board's findings, the employer never made any counterproposals, refused to negotiate, wasn't negotiating in good faith. So what is it about COVID that precluded even the negotiations from occurring? I don't disagree with that, that there may have been some laxity in terms of negotiations. You're looking at a period from March 2020 when COVID hit until the charges were filed in May 2021. So things were very fluid. Everybody in the world, in the country, is trying to adjust to the changing conditions, and then what's happening at the same time is the restaurant is laying people off left and right. And I would refer you, going back to the six-month period before, if you look at the ER 132, where Cesar de la Cruz, he's the employer representative, he describes what they're going through, and he says, prior to my arrival, they had 23 to 24 operations. They are operating at 50 percent capacity. They laid off approximately 1,400 employees. We have 375 employees. This past week, since the stay-at-home order, I had to lay off 50 more. So, counsel, I think we all understand. I mean, we all lived through COVID. We understand that was a very difficult period, and there were a lot of adjustments that had to be made. But I think, back to Judge Sanchez's question, there's no question, I think, I think even the government, and we'll hear from the NLRB, but I think even they can see that that could have changed the negotiation positions. But the question is, how does that give you a right or your clients a right to just refuse to negotiate in good faith? Okay, well, that may be correct, okay, but I can come back to the six-month period, because if we fail to negotiate in good faith early in the pandemic, then six months went by before they filed the charges. So they can't have it both ways. They can't say, the charge is timely, and then we're going to go back and say, no, no, what happened in 2020 really wasn't enough. It wasn't good faith bargaining. But they can have it both ways if you continue to refuse to bargain. So I think the board's answer is it happened again in December and January within the six-month period that the employer, that Grill Concepts, was not bargaining in good faith. Right, and all I'm suggesting is look at what's going on with a restaurant in that six-month period. Okay, look at the shutdowns that were going on in L.A. I don't know about the rest of the country. So what's the precedent for this position that the COVID restrictions or the COVID incident would have allowed no negotiation, or it's an affirmative defense? It's an economic exigencies defense. And what's the case for that? Well, no case is specifically on point. The general counsel of the board early in the pandemic issued guidelines on how to handle the duty to bargain in this situation. It makes sense to me. I mean, it definitely makes sense to me that there would have been terms of a contract that you couldn't establish during the COVID period. But is it your position that there were no terms of a contract that could be figured out? Let me put it this way. When you negotiate a collective bargaining agreement, it's an entire agreement. It's hard to do it piecemeal when you don't know the financial aspects of the wage and the salary. I don't know that that's answering my question. Do you think that there were no provisions that would be part of a CBA that you could discuss before COVID resolved? They could discuss them. But, I mean, as a bargaining position, anybody negotiating anything doesn't do it piecemeal. You do it as a package. So I guess you could have engaged in preliminary discussion. And they did go meet for hours. They did meet a long time. But not in December and January. Not in December, January. But I'm saying focus on the six-month period. Don't hurt us for what happened in 2019. And don't hurt us for what happened. Well, I don't think I am. I think December and January isn't what happened. No, I'm just saying the board. I understand. But here's the other issue. It seems like, at least the board's position, and I want to hear your response to this, is that, you know, there's 159 other restaurants. They all were able to negotiate during this period. Your client was the one who just kind of said, no, we can't, we can't, we can't. They say that, but you don't know the circumstances of the other restaurants. Were there other, okay, fair enough. But were there other restaurants who also refused to negotiate because of COVID? I don't know. The record is just a passing comment, a hearsay comment by somebody on the union side who says, everybody but you negotiated. What does that mean? And did they have a collective bargaining agreement close to being finished? We didn't have one at all. So we're just getting off the ground when COVID hits. So the circumstances are different. I don't think it's fair to compare us to 159 other, when there's no foundation for it. There's no really good ground to do that. I would also point out. Can I just ask briefly about the enforcement action? Because so they issue an order, they find violations, and they issue a remedy. Did your client comply with that? My understanding is that they complied. I don't have the dates. This is post the filing of this action. And the attorney who handled the appeal before I did left my firm. So I'm left with a little bit of a lack of knowledge as to what happened since then. My understanding is that they did negotiate and they have reached agreement on various provisions for the CBA. So my understanding is, secondhand, is that they are making progress. They have been making progress since 2022. And did you file the petition first and then they filed an enforcement action? Or what's the order? That's a good question. I don't know. I think we filed first, but I'll let counsel for the board tell you that. One thing I wanted to cite is a Sixth Circuit decision, which counsel for the board cited. I think it's telling, and I think, you know, I don't want to repeat myself, but if you want an authority to express the concept that I'm talking about, it's National Labor Relations Board versus United Mine Workers, 422 F. 2nd, 1115, pinpoint 122. And this one is cited in the board's letter, the counsel's letter that they filed last week. But it says, and this is citing Bryan Manufacturing, it says, the Supreme Court announced a rule in Bryan Manufacturing which prevents the resurrection of legally defunct unfair labor practices in the guise of evidence and the resultant subversion of the policies promoted by the limitations provision. So the magic words are in the guise of. This is what the board did. In the guise of trying to address unfair bargaining within the six-month period, they hit us with conduct that happened before. Now, Judge Sanchez, I appreciate what you're saying. You can focus on the December and November 2020 incidents, okay, and maybe not a whole lot happened there. I'm not disputing that. I'm just saying that the board took it against us, held it against us in the sense that they, in the guise of they used what happened before in the guise of reaching the conclusion here. I think the only fair thing to do is go back and start all over and redo this entire proceeding. That's why I asked whether it's your position that the conduct that happened in the six-month window would be sufficient to establish a violation or not because if so, it doesn't really matter. I think it does because it changed the entire proceedings. It changed everything because you're, you know, it's like the fruit of the poisonous tree, so to speak. They started with a framework that was biased, and they concluded that, okay, within a six-month period, yeah, you didn't bargain in good faith. Gotcha. But if they only looked at the six-month period, what would the result have been? Maybe different. Okay. Do you want to reserve? I'll reserve. You've got 21 seconds. Thank you. All right. We'll hear from the NLRB. Thank you. May it please the Court, my name is Grace Pazella, and I represent the National Labor Relations Board in this matter. This is a case about an employer who never diligently or in good faith bargained with the statutory representative of its employees. It didn't bargain with the sincere intent to reach an agreement for a year and a half, and when the union filed its charge... Counsel, sorry to stop you right in the middle, but you sort of walked right into the problem that they're complaining of, which is that you seem to be focused on actions outside of the six-month period. So how are we supposed to look at that? I mean, I guess your argument is you're just looking at that for background. You didn't sanction them for anything outside of the six-month period. That's right. So within the six-month period, there is a complete violation. There is evidence. It's not just the two meetings that happened in December and in January. It's that entire six months where every day the employer affirmatively made a choice to not bargain with the union. It's not just the explicit statements that occurred at those meetings where the employer said that they were not prepared to negotiate a contract or that they were not ready to discuss bargaining or proposals. It's the fact that they didn't offer any proposals and would not engage with the union's proposals. And also, when the union reached out on five separate occasions from January, the end of that last meeting, through April 30th and then the charge was filed in the beginning of May, the union reached out five times requesting to set up dates for further negotiating, and the employer never made itself available to set up these sessions. And so there is just consistent evidence of this continuing failure to bargain. It's supported by substantial facts in the record that all occurred within the six-month period. What comfort or argument can you give us that the remedy – I know they're not challenging the remedy, but it seems like the argument is the remedy shows that we were being sanctioned for activity outside of the six-month period. What can you do to assure us that that remedy would have been the same even if you had just looked at the six-month period? Yeah, I think the board was pretty clear that, you know, even though it could have looked at that earlier conduct, as you all pointed out, under Fruhoff and Bryan Manufacturing to assess the remedy, it didn't do so. In fact, it didn't assess any reimbursement remedies for any conduct – bargaining reimbursements for any conduct that happened before that six-month period. It truncated those expenses from the date of the 10B period, that November 2020 date. And it also – I mean, what it did take into effect, which is perfectly reasonable, is that Grill Concepts is a recidivist employer. And so while it did look at the totality of the circumstances as it is required to do to find the bargaining violation, it really, really limited its financial remedies, first of all, and then it simply assessed the other remedies based on the fact that Grill Concepts has shown a proclivity to violate the Act and isn't necessarily taking its responsibilities under the Act seriously. So it's not punishment for prior behavior. It's just looking at the fact that the violation in the 10B period was so egregious, plus the fact that the employer never engaged in good-faith bargaining justifies these remedies. Can you – oh, go ahead. I'm going to switch topics. Well, one question quickly is – no, I lost my train of thought. The violation – you're up here on an enforcement action. What happened post-violation to justify the enforcement action? Did they continue to refuse? Post-violation? Do you mean between the administrative law judge's decision? No, after the board issued its opinion. My sense is that the NLRB is getting very aggressive on enforcement actions, and I want to know what standards are being applied because you found a violation. Did you give them time to comply with that? Did they take any steps in response to the violation, or did you just go straight to an enforcement action? Or was it because they appealed or petitioned, and so you filed your enforcement action in light of that? I would be happy to check with the compliance team on that and get back to the court. It looks like the – I'm looking right now at the docket. The application for enforcement was filed in early 2023, so I could check with our compliance team about that. It sounds like there wasn't – that's my concern here, is that I don't know that there was a lot of time given to actually comply with the order. And so where is that line between an enforcement action and actually working with them? Because it sort of plays into the very point that you – the NLRB has made the determination that they can't be trusted. We're not going to – so we're just going to go in and enforce. And maybe that is discretion that the NLRB has, but why not give them a chance? We heard from counsel, at least that he thought, that they had actually tried to comply with the NLRB's order. I think that the issue is that the employer had never shown any indication that it was willing to bargain with the union. Right, but I want to know, that was prior to the NLRB's finding of a violation. What is it post-violation that triggered the enforcement action? Or is it the position that the NLRB is just going to go straight to enforcement after a violation? No, I won't speak for the board's position on that, but I will say Section 8A.5 is federal law, and it was found in violation of that law. And, you know, our court orders don't – I mean, our board orders don't have a lot of teeth without enforcement. And so it's not as if the NLRA is a new piece of legislation that the employer didn't have a lot of time to comply with. This has been on the books for decades. They have – as you've noticed, and as I've said before, they have violated their obligation under the Act before. And so while I can't speak to precisely what happened between the time the board issue ordered and the time we went for enforcement – Sorry, let me just clarify. When you say they violated the Act before, there were other orders? If so, I might have missed that. There were other orders finding violation? There was a prior case that dealt with the effects of the employer's conduct during the union election. The board discusses that. I mean, am I right in saying this, that it's pretty standard for an appellant to file an appeal from a board action and the board to seek enforcement at the same time, and both of these things come up before a circuit court at the same time? And I almost took it as just kind of a natural progression where the board seeks enforcement, the appellant seeks a review of the agency decision, and both get addressed at the same time in an appellate proceeding. As far as I know, Your Honor, that's the normal operating procedure. I had a couple of questions trying to figure out the government's position with regard to the economic exigency doctrine. So is it the government's position that even during the COVID period, the parties could have reached a completed CBA? It's the government's position that the parties could have gotten together and that the employer could have shown a sincere intent to discuss bargaining and discuss proposals during this time period. Okay, so I understand that answer, and it seems like the answer then to my question is no, you're not taking the position that they could have reached an agreement on all relevant terms that would be needed for a completed CBA. No, we recognize that there needs to be fluidity built into negotiating sessions. Okay, so then that's the premise of my next question, which is my concern here is, I mean, it's not applied in a circumstance like the pandemic, right? The hurricane example is totally different than the other examples. So trying to figure out what that means here. And my concern is if we can't reach a full agreement during this COVID period because there's too many economic unknowns, by requiring the employer to come to the table and negotiate, are we just enforcing busy work requirements? No, thank you. That's a good question, Your Honor. But there are plenty of terms that the parties could have been discussing during this time. A collective bargaining agreement will always have to address, for example, disciplinary procedures and the way that grievances will be played out within the shop. These are substantive and meaty issues that don't really affect the party's finances at all. It's not like a financial outlay to address these issues. Well, but counsel, with due respect to that answer, those violations, if that's what you're relying on, seem to be far afield from the remedy that was enforced. I mean, that wasn't what you were remedying. Part of the reason that we found a violation in this case is because the employer made it explicit that it was not willing to discuss any proposals with the union. It stated that clearly at the January 13th meeting. But I'm just being – I think in response to Judge Forrest's question, you came up with some theories of what they should be bargaining on even under these circumstances. But that's not what the remedy – the remedy went much further than that. Well, I thought the remedy – well, there was an affirmative bargaining remedy. So it was not only cease and desist, but since you haven't been bargaining and you've been willfully noncompliant with the law, we are going to order you to bargain. And isn't that directly related to what's been going on in this case? I mean that seems to be tailored to what you're discussing at this point, counsel, right? That is right. And bargaining isn't just – it's not just – I mean let me expand. So the usual – as I understand it, the usual order is a cease and desist order. The board took the affirmative step of affirmatively ordering bargaining because of the sort of willful noncompliance by the employer. And there was reimbursement expenses within the six-month period. All of that seems tailored to at least the board – in the board's view to the fact that this employer was not only not bargaining but not trying to set bargaining dates, not doing counterproposals, just not discussing certain things. And as we've all recognized, none of that was challenged below or here, right? That's right. So to the extent that we're discussing remedies, they are technically waived. The respondent has raised no substantive challenges, but the duty to bargain contemplates reaching a contract, and that's true. But it also recognizes that there are steps that have to be made to go to that end goal. And the union did try to suggest discussing stewards and discipline and grievances, and the union went so far as to ask the employer if there was any topic that they would be willing to discuss, and the employer said no. Can I ask about that? Please, yes. Just keying off of something that Judge Forrest raised, wasn't one of the union proposals related to if there were going to be layoffs, how would they be carried out by the employer in conjunction with the COVID pandemic? Because I think there were layoffs. So that seems to be a topic that was COVID-related, that the union proposed some way of trying to resolve that issue. And what did the employer do with respect to that proposal? So early in April, shortly after COVID, the union sent around these recall proposals to deal with what would happen based on these employees that had been laid off during COVID. Between April 4th and May 15th, the union sent proposals for the COVID recalls multiple times to the union. The employer's representative said that he would run it by his client, and they never made any substantive progress on that topic. My ignorance about how union negotiating goes, but if the parties had come together and reached agreement on a term or two, the recall term, or I think you had other examples of maybe overtime or some other terms that could have been done even in the context of COVID, if they'd reached agreements on something like that, would those terms be binding even though the parties hadn't reached a completed CBA? Generally, they would be memorialized in some kind of tentative agreement that could be revisited towards the end of the bargaining session. The employer, even before COVID, said that it did not want to reach any tentative agreements with the union, and so it's difficult to keep track of what progress would have been made. I guess I come back to, and that's a helpful answer, but I come back to, is a tentative agreement enforceable? Not before the contract has been ratified. There are some instances where... So then I come back to, so Judge Sanchez makes a great point, but my concern is, if there were terms like recall that would be related to COVID that we could sit down and discuss, but we couldn't actually get to any point where they would be binding on the parties, then aren't we still just talking about... Busy work might not be the right term, but it's futile for this period until we can actually get a full CBA done. I think refusing to come to the table and talk about things that even may be tentative presupposes and almost brings into existence this idea that we'll never get to a point where we can sit down and reach a contract. And parties that have a bargaining relationship, the obligation to bargain runs for the lifetime of that relationship. And so theoretically, at some point in the future, the parties would be able to come together. Sure, but I guess the rub here is that I don't read the record as showing that the employer was saying, we're never going to come to the bargaining table. They kept saying, we're in this situation that is unique and we don't understand the full financial picture and we can't reach a completed agreement. And earlier in response to my questioning, it seemed like you agreed with that, at least to some degree, that there would be some terms that you couldn't fully resolve until all of the COVID restrictions and rules going on in California stabilized. And so then I come back to, how do we say that the employer is acting in bad faith when they're saying, this is the reason that we can't reach a whole agreement and you're not disputing and saying that they're making up something that isn't true? Because a whole agreement has to start with taking the steps to get to the point where you guys can agree on certain proposals. Thank you, Your Honors. Okay, thank you. We'll up you to a minute for a rebuttal. Just quickly, I just wanted to point out that there were some non-returned emails during the spring of 2021. But you've got to look at that in context of the very next month, the employer filed bankruptcy. So that it's, yes, there might have been some lack of surface bargaining. I think it's what it's called, it's busy work, but they wanted us to do surface bargaining, essentially, it's busy work. And they frown upon, the board frowns upon surface bargaining. And now they're, it's like, this is in the spring, and we don't return a couple of emails. And it's like, you get in a car accident and the driver in the other car is dazed, confused, and they want to exchange insurance information. That's what's going on here. They want to do surface bargaining in a context where this employer is just beat up by COVID and the closures. It's just not fair. Okay. Thank you. Thank you to both counsel for your arguments in the case. The case is now submitted.
judges: NELSON, FORREST, SANCHEZ